Michael St. James, CSB No. 95653
St. James Law, P.C.
155 Montgomery Street, Suite 1004
San Francisco, California 94104
(415) 391-7566 Telephone
(415) 391-7568 Facsimile
ecf@stjames-law.com

Proposed Counsel for Debtor

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

In re

BIJOU-MARKET, LLC

        Debtor

Case No. 06-30118 TC
Chapter 11

**DECLARATION OF JOSEPH CAROUBA IN SUPPORT OF FIRST DAY MOTIONS**

I, Joseph Carouba, declare under penalty of perjury:

1. I am the Managing Member of Little Darlings of San Francisco, LLC, which is in turn the sole Member of Bijou-Market, LLC, Debtor and Debtor in Possession (the "Debtor"). I make this Declaration of my own personal knowledge, and if called as a witness I could and would competently testify as follows:

### *The Business*

2. Bijou-Market conducts business operations as live adult theaters from two premises located on opposite sides of the 1100 block of Market Street in San Francisco. The premises are commonly known as the Market Street Cinema and La Gals (collectively, the "Clubs").

3. Although business operations are profitable, they are not robustly so. Net operating profit in 2005 aggregated only about $100,000.

4. Bijou-Market has no secured debt.

5. Bijou-Market has no tax debt.

6. Bijou-Market has no undisputed, non-contingent liabilities that have not been or would not be (absent the bankruptcy filing) paid on a current basis in the ordinary course of business.

### *The Minami Lawsuit*

7. The Debtor has commenced this case solely to address and resolve the claims asserted in *Roe v. Bijou-Century, LLC et al.* (the "Minami Lawsuit") prosecuted by the Minami, Lew & Tanaki law firm. The Minami Lawsuit is a Dancer Class Action as to which class action certification has not as yet been sought.

8. I have been active in the management of live adult theatres for the past decade and am very familiar with the industry. In recent years, the live adult theater industry has been hit by a number of Dancer Class Action lawsuits. They follow a predictable pattern:

    a. The Plaintiffs' counsel alleges some form of violation of employment laws respecting the treatment of dancers generally.

    b. The Plaintiffs' counsel advocates the highest possible hypothetical aggregate damages by estimating the aggregate claims a given dancer might successfully assert and then multiplying that by the largest arguable universe of potential dancer claimants.

CAROUBA DECLARATION                                                                                                    1

c. The Plaintiff's counsel then asserts a claim for attorney's fees measured as a percentage of this hypothetical aggregate liability.

d. Dancers are *then* solicited to file claims against the funds. Dancer claims actually asserted against the fund are routinely a small fraction (e.g., less than 5%) of the hypothetical aggregate liability.

9. The actual material economic beneficiary of a Dancer Class Action is class action counsel, and not the class of Dancers they purport to represent. Indeed, I have been involved in settlement conferences in which Class Action counsel expressly and directly re-allocated to class action counsel's attorneys fees money that we had previously agreed to pay to its Dancer clients

10. I was actively involved in *Siefred v. Centerfolds.*, a Dancer Class action involving four clubs. In that case, class action counsel received a fee of $245,000 and $222,000 was set aside as a settlement fund for class members. Only 42 out of 2822 class members participated in the settlement fund, receiving an aggregate of approximately $49,000; and the residue, consisting of the vast majority of the fund – $173,000 – was ordered paid to charity. The attorneys received five time the amount distributed to their clients.

11. As a result of my involvement in the industry and as the representative of defendants in three Dancer Class Actions, I am aware of the results of other such cases.

a. In *Alger v. New Wave* only 19 out of 250 class members participated in the settlement fund; the vast majority of the fund was paid to Plaintiffs' counsel.

b. In *Cadena v. Déjà Vu* only 12 dancers consented to being contacted by Plaintiffs' counsel, notwithstanding court-ordered daily handouts for a continuous 30 day period in 24 nightclubs.

12. The Minami Lawsuit appears entirely consistent with the Dancer Class Action pattern. Its core allegations are that a former manager engaged in a practice of forced tip-outs and that dancers were permitted to work longer hours than the hours for which they received wages (gratuities constitute the primary economic focus for dancers). The Debtor has long since taken corrective measures such that neither complaint applies to its current operations.

CAROUBA DECLARATION                                                                    2

## The Intended Reorganization

13. Attached hereto as Exhibit A is true and correct copy of a calculation prepared by the Minami Firm identifying the aggregate hypothetical claims asserted in the Minami Lawsuit as $66,157,389.40. Clearly, if these assertions represented realistic measures of liability, a business that generates $100,000 of annual profits cannot satisfy them. Indeed, the Debtor filed this case because it cannot even afford to fund the readily anticipated attorneys fees associated merely with defending the Minami Lawsuit.

14. I do not believe, however, that the Plaintiff's claims represent realistic measures of the Debtor's liability. If past experience is any guide, few claims will actually be filed and the Debtor will be able to pay the actual Dancer claims in full, either from internally generated funds, or, if necessary, from collections or borrowings.

15. I therefore intend, promptly after the running of the Claims Bar Date, to propose a Plan of Reorganization that pays all claims in full.

## Claims Bar Date

16. I think it essential that the Court establish a Claims Bar Date and appropriate noticing procedures so that the Debtor's aggregate liability to Dancers can be determined.

17. I understand that the norm in bankruptcy cases is to give notice of a Claims Bar Date to creditors at their last known address. The Debtor is in the process of compiling a mailing list (the "Dancer Mailing List") that includes the last known addresses of all Dancers, compiled from their payroll records. This mailing list will include all Dancers who worked at either Club since 1999, which includes all of the potential members of the proposed class in the Minami Lawsuit.

18. Dancers are often itinerant, and it will likely be the case that over the ensuing years many of the Dancers have moved without leaving forwarding addresses. In order to ensure the best reasonably practicable notice, therefore, two additional mechanisms might be utilized.

19. The Debtor could post the notice in the two Clubs for 30 days. To the extent that Dancers continue to work in the Clubs, or maintain social relations with Dancers who work in the Clubs, this might provide actual notice of the Claims Bar Date.

CAROUBA DECLARATION                                                                                                  3

20. Finally, the Debtor would propose to give notice by publication. For these purposes, I think that the *Bay Guardian* is the periodical of general circulation most likely to be seen by Dancers.

21. I believe that the foregoing three measures – mailed notice to the Dancers' last known address, posting in the Clubs and notice by publication in the *Bay Guardian* – represent the best available method of giving notice of the Claims Bar Date to Dancers.

22. I expect that the aggregate of the claims that will actually be filed in this case will be commensurate with the Debtor's ability to pay them, and expect promptly after the running of the Claims Bar Date to propose a Plan of Reorganization that offers to pay all creditors in full. In the exceedingly unlikely case that $66 million in Dancer claims – or a lesser but very substantial amount – are filed, it will be impossible to formulate a Plan of Reorganization without understanding the nature and magnitude of the claims.

23. Thus, this bankruptcy case cannot go forward to a resolution until a Claims Bar Date passes. For this reason, I believe that the Court should set a Claims Bar Date and approve noticing procedures as rapidly as possible.

24. In addition, operation in Chapter 11 imposes an additional layer of administrative burden and expense. It would be in the best interests of creditors and the estate to minimize this burden and expense by making it possible promptly to effect a reorganization in this case, which can only occur after the Claims Bar Date has run.

### *Utilities*

25. The Debtor has always paid its utilities bills on a current basis and, but for the prohibition on paying pre-petition general unsecured claims, would continue to do so. The Debtor believes that the aggregate exposure of the utilities will be limited to the deferral of current pre-petition charges, that is, one month's utilities bills, until confirmation of a Plan of Reorganization. As noted, the Debtor intends to propose payment of all claims in full.

26. Under the circumstances, I believe that one month's average utility bills would represent an appropriate post-petition deposit. Attached hereto as Exhibit B is a schedule identifying the Debtor's Utilities and calculating the current average monthly utilities bills.

## Employees

27. The Debtor funds payroll to its employees on alternating Fridays, but pays employees one week in arrears. The Debtor funded its most recent payroll on Friday, February 24, 2006, which compensated employees for services performed through but not including Sunday, February 18, 2006. Thus, as of the filing date, employees had accrued but not been paid wages for the period February 18, 2006 through February 28, 2006 (the "Pre-Petition Wage Period").

28. Attached hereto as Exhibit C is my best estimate of the Debtor's liability to its employees for wages associated with the pre-petition wage period. In many instances the employee may work greater or fewer hours and thus may be entitled to greater or lesser compensation than these estimates, but I believe that Exhibit C fairly portrays the Debtor's likely liability for pre-petition wages.

29. As reflected in Exhibit C, the Debtor's employees are not highly compensated. Deferring receipt of the pre-petition wages, constituting approximately one-third of the employee's monthly compensation, until the conclusion of the bankruptcy case would constitute a very substantial hardship for the employees and might well lead them to quit, severely disrupting the Debtor's ability to conduct business.

30. The Debtor intends to propose a Plan of Reorganization under which all allowed claims will be paid in full. The Debtor's operations are profitable and the Debtor has no secured debt, so under any set of circumstances the estate will inevitably pay all priority wage claims in full. I believe that there is no benefit that would accrue to creditors or the estate from deferring payment of pre-petition wages until the conclusion of the case. I believe that timely funding employee pre-petition wages would be fitting and appropriate and in the best interest of creditors of the estate.

31. The most efficient and effective mechanism to implement this relief would be to fund the next payroll, due on March 7, 2006, without regard to whether the services for which the payroll relates were performed pre-petition or post-petition. Doing so will discharge all pre-petition wage claims.

32. The Debtor also requests that it be authorized to provide sick leave and vacation leave to the two employees entitled to receive it as those obligations come due in the ordinary course of business. The only employees entitled to vacation pay are George Britton (2 weeks, or $6,000) and Ernesto Salak (2 weeks, or $4,200). Such performance will discharge all of the Debtor's wage priority obligations.

CAROUBA DECLARATION                                                                 5

33. If the foregoing authorization is granted, I would ask that the employees be stricken from the Court's Master Mailing list. I believe that repeated reminders that their employer is in bankruptcy would likely distress and unsettle employees and would serve no appropriate purpose.

34. I therefore request that, if the Debtor is authorized to honor its employees' priority wage claims, that it also be authorized to file an amended Schedule E reflecting the absence of outstanding wage priority obligations and that the Court strike from the creditor Mailing Matrix the persons who had been added to that Matrix solely on the basis of their claim for pre-petition wages.

I declare under penalty of perjury according to the laws of the United States of America that the foregoing is true and correct and that this Declaration was executed in San Francisco, California on February 28, 2006

*Joseph Carouba*

Case: 06-30118   Doc# 13   Filed: 03/01/06   Entered: 03/01/06 11:52:27   Page 7 of 15
CAROUBA DECLARATION                                                                                6

# EXHIBITS

Exhibit A: Calculation of Claim in Minami Lawsuit

Exhibit B: Average Monthly Utilities Charges

Exhibit C: Estimated Pre-Petition Payroll

# EXHIBIT A

# Claim Calculation in Minami Lawsuit

F. **Total Damages**

| Market Street Cinema | Total Alone | Total With Interest |
|---|---|---|
| Wages | $3,742,200 | $5,060,745 |
| Overtime | $1,723,314.60 | $2,319,714.40 |
| Meal Time Breaks | $2,494,800 | $3,373,830 |
| Penalties | $486,000 | $486,000 |
| Costume Reimbursement | $750,000 | $750,000 |
| Stage Fees | $41,332,000 | $54,167,100 |
| **Grand Total for Market Street Cinema** | **$50,528,314.60** | **$66,157,389.40** |

//

# EXHIBIT B

# Recent Utility Billings

# Bijou-Market, LLC
## Schedule of Utility Payments
### December 2005 through February 2006

| | December | January | February | 3-Month Total: | Average: |
|---|---|---|---|---|---|
| Pacific Gas and Electric | 4,917.22 | 1,167.83 | 8,815.56 | 14,900.61 | 4,966.87 |
| Golden Gate Disposal | 818.53 | 806.30 | 806.30 | 2,431.13 | 810.38 |
| Verizon Wireless | 108.04 | 112.16 | 113.37 | 333.57 | 111.19 |
| XO Communications | 502.50 | 430.64 | 476.96 | 1,410.10 | 470.03 |
| Sprint | 180.82 | | 156.00 | 336.82 | 168.41 |
| SBC | 489.43 | 166.24 | 97.05 | 752.72 | 250.91 |
| MCI Worldcom | | 7.59 | | 7.59 | 3.80 |
| S F Public Utilites Comm. | | 1,004.77 | 1,593.25 | 2,598.02 | 1,299.01 |
| | | | | | 8,080.59 |

Diana/San Francisco/Bijou Market Bankruptcy Questions                              2/27/2006 8:03 AM dsw

# EXHIBIT C

**Estimated Pre-Petition Wages**

| MARKET STREET & LAGALS GROSS WAGES FROM 2/19/06-2/28/06 | | | | | | Estimated Reg hours | Estimated Ot hours | Vac hours | Gross Wages |
|---|---|---|---|---|---|---|---|---|---|
| Name | Address | City | State | Zip code | Rate | | | | |
| ALAZRAIE, MIZYED | 120 MASON ST | SAN FRANCISCO | CA | 94102 | $ 8.62 | 56 | | | $ 482.72 |
| ALLEN, CHRISTOPHER J | 1210 ALAMO WAY | PITTSBURG | CA | 94565 | $ 8.62 | 48 | | | $ 413.76 |
| ANAYA, EDWIN | 2768 11TH ST | SAN PABLO | CA | 94806 | $ 11.00 | 48 | | | $ 528.00 |
| BENNETT, NATASHA | 354 VELASCO AVE | SAN FRANCISCO | CA | 94134 | $ 9.00 | 40 | | | $ 360.00 |
| BLANEY, JENNIFER A | 42 TALBERT ST | SAN FRANCISCO | CA | 94134 | $ 10.00 | 40 | | | $ 400.00 |
| BRITTON, GEORGE J | 2416 W. TENNYSON RD #232 | HAYWARD | CA | 94545 | salary | 80 | | 40 | $ 3,000.00 |
| BUNCH, GERALD J | 1499 CALIFORNIA ST #421 | SAN FRANCISCO | CA | 94109 | salary | 80 | | | $ 1,400.00 |
| BUSTILLO, JESSICA | 270 TURK ST #105 | SAN FRANCISCO | CA | 94102 | $ 9.00 | 40 | | | $ 360.00 |
| BUTLER, TERRELL | 542 PAGE ST | SAN JOSE | CA | 95126 | $ 13.00 | 56 | | | $ 728.00 |
| CARR, MARCUS | 401 WALNUT AVE #1 | S. SAN FRANCISCO | CA | 94080 | $ 10.00 | 56 | | | $ 560.00 |
| CHISHOLM, GLEN | 56 MASON ST #301 | SAN FRANCISCO | CA | 94102 | $ 8.62 | 56 | | | $ 482.72 |
| COUSART, FREDDRICK | 314 PALMETTO AVE #38 | PACIFICA | CA | 94044 | $ 9.00 | 40 | | | $ 360.00 |
| DAVIS, WILLIE D | 520 S VAN NESS #254 | SAN FRANCISCO | CA | 94110 | $ 8.75 | 30 | | | $ 262.50 |
| FERRER, SALVADOR | 4115 SAN BRUNO AVE | SAN FRANCISCO | CA | 94134 | $ 8.75 | 48 | | | $ 420.00 |
| GALINDES, SALVADOR C | 88 6TH ST #328 | SAN FRANCISCO | CA | 94103 | $ 8.62 | 48 | | | $ 413.76 |
| GARCIA, MARK | 35 CASTLE MANOR AVE | SAN FRANCISCO | CA | 94112 | salary | 80 | | | $ 1,200.00 |
| HERNANDEZ, GERARDO M | 2014 5TH AVE #103 | OAKLAND | CA | 94606 | $ 9.38 | 48 | | | $ 450.24 |
| HUANG, JIAN X | 542 42ND ST | RICHMOND | CA | 94805 | $ 8.62 | 48 | | | $ 413.76 |
| IBRAHIM, SAMIR I | 33 PRECITA AVE #B | SAN FRANCISCO | CA | 94110 | $ 8.62 | 32 | | | $ 275.84 |
| JONES, WALTER | 2305 7TH ST | BERKELEY | CA | 94710 | $ 8.62 | 48 | | | $ 413.76 |
| KERNS, JAMES M | 80 HARRIS PL #26 | FREMONT | CA | 94536 | $ 9.00 | 35 | | | $ 315.00 |
| KING, ANTHONY | 55 MASON ST APT 619 | SAN FRANCISCO | CA | 94102 | $ 11.25 | 40 | | | $ 450.00 |
| LAMMAM, ANTOINE | 937 GUERRERO ST | SAN FRANCISCO | CA | 94110 | $ 8.75 | 56 | | | $ 490.00 |
| LAMMAM, EMILE | 4513 BYRNE CT | SANTA ROSA | CA | 95409 | $ 9.38 | 56 | | | $ 525.28 |
| LEGASPI, MARK | 1317 SANTA CLARA | ALAMEDA | CA | 94501 | $ 9.00 | 30 | | | $ 270.00 |
| LOPEZ, MICHAEL | 22169 MAIN ST | HAYWARD | CA | 94541 | $ 9.00 | 36 | | | $ 324.00 |
| LORENZETTI, KENNETH | 436 PEARL AVE | MONROVIA | CA | 91016 | $ 10.00 | 40 | 20 | | $ 700.00 |
| LUNA, ANNA | 3265 26TH ST #1 | SAN FRANCISCO | CA | 94110 | $ 8.75 | 48 | | | $ 420.00 |
| MITCHELL, SHANNON | 6531 MANILA AVE #3 | EL CERITO | CA | 94530 | $ 8.62 | 48 | | | $ 413.76 |
| NAZARI, FRED | 4 COMMODORE DR #523 | EMERYVILLE | CA | 94608 | $ 8.62 | 48 | | | $ 413.76 |
| QUEVEDO-LOPEZ, ANA D | 1916 MISSION ST | SAN FRANCISCO | CA | 94103 | $ 8.62 | 56 | | | $ 48.72 |
| SALAK, ERNESTO | 479 GELLERT BLVD | DALY CITY | CA | 94015 | salary | 80 | | 40 | $ 2,100.00 |
| SALAZAR, ALVARO | 4149 NULTY DR | CONCORD | CA | 95040 | $ 8.75 | 40 | | | $ 350.00 |
| SAO, IOSE M | 1259 41ST AVE | SAN FRANCISCO | CA | 94122 | $ 10.00 | 48 | | | $ 480.00 |
| SINGH, NARINDER | 1230 MARKET ST #502 | SAN FRANCISCO | CA | 94102 | $ 8.62 | 56 | | | $ 482.72 |
| SMITH, DWIGHT | 921 APGAR ST | OAKLAND | CA | 94608 | $ 9.00 | 40 | | | $ 360.00 |
| SORIA, PAUL J | 34 TURK ST #341 | SAN FRANCISCO | CA | 94102 | $ 8.62 | 64 | | | $ 551.68 |
| STARICCO, CHRISTOPHER J | 55 30TH ST #22 | SAN FRANCISCO | CA | 94110 | $ 10.00 | 48 | | | $ 480.00 |
| STARICCO, MICHAEL | 55 30TH ST #22 | SAN FRANCISCO | CA | 94110 | $ 10.00 | 48 | | | $ 480.00 |

| Name | Address | City | State | Zip | Rate | Hours | | | Amount |
|---|---|---|---|---|---|---|---|---|---|
| STEPHENS, DOUGLAS | 3704 WEST #B | OAKLAND | CA | 94609 | $ 9.00 | 40 | | | $ 360.00 |
| STEWART-HANSON, JASON | 1993 SHOREVIEW AVE | SAN MATEO | CA | 94401 | $ 8.62 | 16 | | | $ 137.92 |
| WEATHERSBY, JOHN | 5109 62ND ST | SACRAMENTO | CA | 95820 | salary | 80 | | | $ 1,100.00 |
| ZIESCHE, SHERRI | 1338 LARKIN ST | SAN FRANCISCO | CA | 94109 | salary | 80 | | 80 | $ 2,800.00 |